UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DANIEL P. MOOK, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:23cv00028 |
| | ) | |
| CITY OF MARTINSVILLE, VIRGINIA, | ) | |
| and G. ANDREW HALL, | ) | |
| | ) | |
| *Defendants*. | ) | |

### DEFENDANT CITY OF MARTINSVILLE, VIRGINIA'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant City of Martinsville, Virginia (the "City") by counsel, submits this memorandum in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### STATEMENT OF THE CASE

Plaintiff Daniel P. Mook originally filed this lawsuit on November 16, 2023, alleging in a sole count against a single defendant that by terminating his employment, the City of Martinsville interfered with his right to take leave under the Family and Medical Leave Act of 1993 (hereinafter "FMLA") under 29 U.S.C. § 2615(a)(1).  The City of Martinsville filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, alleging that the City was not Mr. Mook's employer, and also that Mr. Mook did not adequately state a claim under the Family and Medical Leave Act ("FMLA").

Mr. Mook filed an amended complaint on December 29, 2023, naming both the City and G. Andrew Hall, the Commonwealth's Attorney for City of Martinsville as defendants and seeking reinstatement of his employment, compensatory and liquidated damages of $500,000.00,

his attorneys' fees, costs of suit, and pre- and post-judgment interest. The parties filed respective motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and on June 14, 2024, this Court denied both motions.

Discovery has closed, and this matter is ripe for summary judgment.

<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Mr. Mook is an attorney, who was hired as an Assistant Commonwealth Attorney for the City of Martinsville by Commonwealth's Attorney, G. Andrew Hall, on April 3, 2018. Deposition[1] of G. Andrew Hall Transcript dated December 17, 2024, (hereinafter Hall Tr. ___), 6:15-16; Deposition of Daniel P. Mook Transcript dated February 11, 2025, (hereinafter Mook Tr. ___) 22:1-4, 26:8-10.  Hall terminated Mook's employment on November 18, 2021. Hall Tr. 6:20-7:1. Mook's salary at termination was approximately $74,000 plus benefits. Mook Tr. 35:3-6.

Mr. Mook requested and was granted leave under FMLA, beginning November 1, 2021, to care for his mother Shirley Mook, who has osteoporosis and osteoarthritis. Prior to departing the office on October 29, 2021, he requested and received a Certification of Health Care Provider for Family Member's Serious Health Condition (the "Certification") to be filled out by his mother's doctor. The applicable Certification is attached to the plaintiff's Amended Complaint at ECF #7-1. This form is provided by the U.S. Department of Labor, Wage and Hour Division, and includes three sections: Section I is completed by the employer, Section II is completed by the employee, and Section III is completed by and signed by the health care provider. It has blanks for descriptions of the serious medical condition, the likely duration of it, the amount of

---

[1] To avoid unnecessarily contributing to the size of the casefile, the City will refer to and rely upon the deposition transcripts filed in this matter by co-defendant G. Andrew Hall, which were filed as exhibits to his motion for summary judgment (ECF 52).

family medical leave needed, and for family members who are seeking leave based on needing to care for another family member, certification that such care is medically necessary and a description of what assistance the employee will need to provide for the ill family member. *See id.*

Section I, the employer section of the form, was completed by Mr. Hall's staff and dated 10/29/21. Section II was completed and signed by Mr. Mook. Mr. Mook also completed Section III, the health care provider section. Am. Compl. ¶ 12. "Mook completed the Certification by hand with his mother's demographic and medical information, based on his knowledge of her condition." *Id.* He took the completed form with him when he accompanied his mother to a clinic appointment on November 12, 2021. *Id.* ¶ 13. His mother was going to the clinic for the purpose of receiving her bi-annual Prolia injection, which is used to treat osteoarthritis. Deposition of Scott Schmidt, RN, dated February 11, 2025 (hereinafter Schmidt Tr. ___) at 12:13-14, 28:15-22; Deposition of Lisa Francis, M.D. dated February 11, 2025 (hereinafter Francis Tr. ___) at 11-19. The appointment was not for the purpose of seeing her doctor, Dr. Lisa Francis. Francis Tr. 28:4-14. The appointment lasted 5-15 minutes, during which time Nurse Scott Schmidt took her vitals, checked her lab results, and administered the injection. Schmidt Tr. 18:9-13, 31:2-32:2.

Mr. Mook informed Nurse Schmidt that he had to complete a form for his employer, that he had filled out the entire form, and that if the nurse needed to change anything he could. Mook Tr. 29:9-13. Nurse Schmidt took the form, thinks he may have corrected the provider's address on the form, and signed it with his own name with "per Dr. Francis" written below it. ECF #7-1; Schmidt Tr. 14:11-18, 25:12-14, 26:1-14, 35:16-36:11. Nurse Schmidt believed he was signing a form indicating that Mr. Mook accompanied his mother to the appointment that day because the only kinds of forms that nurses are permitted to sign are forms for the day of the appointment.

3

Schmidt Tr. 11:9-19, 57:8-22.  He thought he was signing a sick note or work excuse for that day.  *Id*. 11:20-12:2. Nurse Schmidt did not recall having ever seen the entire four sheets of the Certification or even page 1 of the form which is entitled, "Certification of Health Care Provider for Family Member's Serious Health Condition under the Family Medical Leave Act" on the day he was asked to sign the form.  *Id*. 22:7-16, 24:8-12, 44:21-22, 47:1-6. Nurse Schmidt did not know that he was being asked to sign FMLA papers.  If he had seen a bunch of papers for FMLA, the papers would have gone to Dr. Francis.  He did not understand why – if it was an FMLA form – Mr. Mook gave it to him versus giving it to the doctor when they saw the doctor. *Id*. 13:13-16, 13:21-14:1, 38:6-39:6.

 Mr. Mook never spoke to his mother's doctor, Dr. Lisa Francis, on November 12, 2021. Mook Tr. 29:18-20.  He did not attempt to have Dr. Francis complete the form for him at that time. *Id*. at 31:9-14.

Mr. Mook then scanned and emailed this form to Nancy Sherman, the office manager for the Commonwealth Attorney's office, and to the City's Human Resources department. Mook Tr. 31:7-8.

Issues arose with the authenticity of the Certification almost immediately. Am. Compl. ¶15. The Human Resources Department informed Ms. Nancy Sherman, Mr. Hall's administrative assistant, that the medical certification section appeared to have been completed by the same person (Mook) who completed the employee's section of the form, which gave rise to concerns about the authenticity of the form.  Hall Tr. 21:5-12; *see* Declaration of Travis Hodge dated April 17, 2025, (hereinafter Hodge Decl. ___) at ¶ 9.  Ms. Sherman contacted the doctor's office and spoke with a nurse by the name of Beth Foley, who confirmed with Dr. Francis that she had not seen the form and did not approve the completed form. Hall Tr. 43:1-4;

4

Francis Tr. 20:17-20, 40:18-41:4. Nurses do not have the authority to sign FMLA forms.  Hall

Tr. 25:6-8; Schmidt 15:13-14; Francis Tr. 12:21-13:14, 17:7-10. Ms. Sherman faxed a copy of

the form to Nurse Foley, who confirmed that Nurse Schmidt signed the form but believed that he

was signing a note for missing work for the day of the appointment.  Hall Tr. 24:11-24; 42:14-

16; Schmidt Tr. 16:3-7, 16:12-21. Mr. Hall was informed that only a doctor in that medical

practice had the authority to complete and sign the medical provider's certification.  Hall Tr.

25:9-10; Francis Tr. 13:12-14. No one in Dr. Francis' office completed any of the pertinent

medical information contained in Section III of the form.  Hall Tr. 42:20-23.

    Mr. Hall advised Mr. Mook that he had been informed of concerns about the authenticity

of the FMLA certification, that Mr. Mook told the nurse that Mr. Mook basically needed a work

excuse signed and that the nurse signed it, that the nurse claimed he only signed the form for the

day of the appointment, that the nurse did not know that he was signing an FMLA form, and that

the doctor did not approve the signed FMLA form.  Hall Tr. 22:1-6; *see* Francis Tr. 13:18-20.

He provided Mr. Mook with an opportunity to explain his side of the situation. Hall Tr. 30:4-9.

    From Mr. Hall's perspective, Mr. Mook was being evasive and not completely forthright

in his responses to Mr. Hall's questions.  Hall Tr. 30:24-25; 31:17-18; 50:18-20; 52:20-25;

53:22-24.  He thought that Mr. Mook showed poor judgment in completing the medical

provider's portion of the certification.  *Id.* 31:1-3, 31:16-17; 50:22-24.  Mr. Hall also thought that

Mr. Mook had lied to Nurse Schmidt to obtain Nurse Schmidt's signature on the FMLA form.

*Id.* 31:18-19; 50:24-2.  He thought that Mr. Mook was dishonest in denying that he had sought

the nurse's signature under the guise of signing a work excuse.  *Id.* 51:2-3; 54:19-21.  Because

Mr. Hall had a concern regarding Mr. Mook's judgment and honesty and integrity as an assistant

Commonwealth's attorney, he had to let Mr. Mook go.  *Id.* 31:19-24; 51:4-6.  Mr. Hall's decision

had nothing to do with Mr. Mook being on family medical leave. *Id*. 31:25-1; 68:5, 13-16; 69:23-25.

Among Mr. Hall's concerns related to Mr. Mook's judgment, honesty, and integrity were the following: Mr. Mook admitted to completing the section of the certification reserved for medical providers (Hall Tr. 33:9-11); between the nurse and Mr. Mook, someone was lying, and Mr. Hall believed it was Mr. Mook (*id*. 33:11-18) because the nurse admitted to doing something wrong in not reviewing the document before signing it and had no reason to lie (*id*. 46:10-11); Mr. Mook obtained the nurse's signature fraudulently by lying to the nurse (*id*. 47:5-8); and Mr. Mook's email response to Mr. Hall's telephone call made him feel that Mr. Mook was being more dishonest because the email contained many other statements that were not true. *Id*. 61:3-5. Mr. Hall felt that Mr. Mook was spinning what happened, not being precisely clear, and taking angles. *Id*. 71:21-72:3.

Mr. Mook agrees that Mr. Hall's concern was that Mr. Mook was dishonest and that he had falsified information or presented false information to the nurse in order to solicit his signature on the form. Mook Tr. 34:8-9, 34:19-21.

Mr. Hall advised Mr. Mook that he could resign that day or be fired. Mr. Mook refused to resign and was terminated that day, November 18, 2021. Am. Compl. ¶¶ 16, 17; Hall Tr. 30:18-19, 57:9-18.

On November 22, 2021, Mr. Mook took his mother to see Dr. Lisa Francis so that she could complete an FMLA certification. Francis Tr. 11:3-21; Mook 32:5. Dr. Francis signed the certification because Mrs. Mook "needed somebody to take care of her for the surgical procedure and the recovery period after that." Francis Tr. 15:9-11. Dr. Francis' certification was only for the time period after Mrs. Mook's surgery because she would need assistance after the surgery.

6

She did not certify that Mrs. Mook's diagnosis of osteoporosis required or necessitated assistance with dressing, meal preparation, and transportation generally. The certification was completed in anticipation of postsurgical treatment. Francis Tr. 34:4-15. The certification was from the date of surgery to the amount of time needed post-surgery to recover. Francis 36:14-15. Mrs. Mook had surgery in **March of 2022**. Francis Tr. 37:2; Mook Tr. 69:15-22. There was no surgery in November or December of 2021. *Id*. 37:3-4. Mrs. Mook's period of incapacity would occur approximately three times a day post-surgery. *Id*. 39:11-14. Dr. Francis did not certify that Mrs. Mook needed assistance or was incapacitated between November of 2021, when Mr. Mook took leave, and March of 2022, when Mrs. Mook had surgery. *See id*.

When Mr. Mook submitted his FMLA form for leave beginning on November 1, 2021, he requested 120 days of leave. Mook Tr. 70:12-71:3. He would have exhausted his available FMLA leave prior to his mother's scheduled surgery in March of 2022 – the surgery which was the basis upon which Dr. Francis certified Ms. Mook's medical need and Mr. Mook's FMLA leave. *Id*. 71:17-22, 72:5-11. Because his FMLA leave would end before his mother's surgery, Mr. Mook intended to have her admitted to an assisted living facility after her surgery. *Id*. 72:20-6. Mr. Mook decided to take FMLA leave in November of 2021 because his son, who lived in Wisconsin, was going through a difficult divorce at the time and was no longer able to help with his grandmother. *Id*. 96:12-18.

Mr. Mook asserts that the City of Martinsville is his employer. Mr. Hall admits, however, that he is Mr. Mook's employer. Hall Tr. 90: 9-16. Mr. Hall is a Constitutional officer. *Id*. 77:12. Other than the voters of the City of Martinsville, Mr. Hall had no bosses; the mayor, City Council, and City Attorney are not his bosses. *Id*. 17-23. One of Mr. Hall's responsibilities as a Constitutional officer is to staff his office with attorneys. *Id*. 79:14-19. He is the only

person with authority to hire attorneys for his office.  *Id*. 79:20-22. He hired Mr. Mook and the four or five other attorneys who work in his office.  *Id*. 6:15-16; 12:16-19.  The attorneys who work in his office are not employed by the City of Martinsville.  *Id*. 12:17-19; *see* Hodge Decl. ¶¶ 2-3.  Mr. Hall is the only person with the authority to promote or demote the attorneys in his office.  Hall Tr. 80:4-7.  He was not required to obtain approval from City Council or the City Manager to make personnel decisions.  *Id*. 80:8-14. No one in the City can give Mr. Hall orders on how to operate his office.  *Id*. 78:1-4. It is Mr. Hall's job to supervise and direct the day-to-day job responsibilities of the attorneys in his office.  *Id*. 80:15-19.  Mr. Hall supervised Mr. Mook.  Mook Tr. 26:8-10, 88:1-3. He directed Mr. Mook's work.  *Id*. 88:4-7.  He provided Mr. Mook with the equipment necessary to perform his job, including computers, which were owned by the Commonwealth Attorney.  *Id*. 89:10-934:2. He also had the authority to discipline Mr. Mook.  *Id*. 88:8-10.  Mr. Hall terminated Mr. Mook's employment.  Hall Tr. 6:20-7:1; Mook Tr. 94:9-15. Mr. Hall is the only person with the authority to terminate any attorney in his office. Hall Tr. 80:1-3.

Employees of the City of Martinsville, on the other hand, are supervised by the City Manager.  Hodge Decl. ¶ 3. The City Manager does not supervise the employees of any Constitutional officer.  *Id*. Employees of Constitutional officers are also not bound by the personnel policies that guide the employment of City of Martinville employees. *Id*.

The Human Resources Department did not make any employment decisions with respect to Mr. Mook.  Hodge Decl. ¶ 7.  No one in the City of Martinsville's government provided Mr. Hall with direction as to determining the future of Mr. Mook's employment, instruct Mr. Hall to terminate Mr. Mook's employment, or recommend termination of Mr. Mook's employment. Hall Tr. 25:11-20; 26:1-9; 26:19-23; 26:24-27:1; 27:2-4.  Mr. Hall did not seek legal counsel

from the City Attorney or any outside legal counsel retained by the City before terminating Mr.

Mook.  He made the decision to terminate Mr. Mook on his own, using his own judgment. *Id*.

56:1-3.

Mr. Hall – through his employee Nancy Sherman – did receive advice from Human

Resources regarding Mr. Mook's employment.  Hall Tr. 28:2-14. Constitutional officers are not

obligated to use the support provided by the Human Resources Department and can disregard

any recommendation or information provided by the Department.  Hodge Decl. ¶ 6; Hall Tr.

56:16-19; 79:6-13.  Assuming such a request was made, Mr. Hall had the authority to ignore any

request or directive to fire Mr. Mook that came from the City.  Hall Tr. 57:5-8. Mr. Hall is aware

of nothing under the law that would bind him to follow any recommendation that he received

from anyone in the City government.  Hall Tr. 78:10-12.

The City of Martinsville provides logistical support to Constitutional officers such as Mr.

Hall much like a private payroll processing company would provide for a small business.  Hodge

Dec. ¶ 4; Hall Tr. 88:21-89:3.  The Human Resources Department provides forms for the

Constitutional officers to use in managing their employees, such as leave forms under the Family

Medical Leave Act, forms for Constitutional employees to enroll in insurance plans if the

Constitutional officer has made such benefit available to his employees, forms for onboarding

and payroll processing, employee evaluation forms, forms to request paid leave, and other

personnel forms.  Hodge Decl. ¶ 4; *see* Hall Tr. 12:19-23; 13:5-9, 21-25.[2]  Those forms are

completed by the Constitutional officer and the officer's employees.  Hodge Decl. ¶ 4.

---

[2] Other agencies also assist Constitutional Officers with administration of personnel benefits, including the Virginia
Retirement System and the Virginia Comp Board.  Hall Tr. 13:19-20; 14:1-5; 14:9-15:2.

No one employed by the City told Mr. Mook that he was not eligible for FMLA.  Mook Tr. 69:10-14.

No one in Human Resources directed Mr. Hall to deny Mr. Mook's FMLA leave request. Hall Tr. 85:24-86:1; Hodge Decl. ¶ 12.  Human Resources would make sure that Mr. Hall told the employee requesting leave what was expected of them for family medical leave in terms of documentation and deadlines and would review the materials.  Hall Tr. 90:21-25.  If one of Mr. Hall's employees took FMLA leave, the employee would initially reach out to him, and he would direct them to Ms. Sherman, who would explain the process to them, make sure they knew about the paperwork, and make sure they got the paperwork.  *Id*. 95:1-7.  Ms. Sherman would provide those forms to Mr. Hall's employees.  *Id*. 95:20-24.  If there was a problem with the materials, Human Resources would notify Mr. Hall, and if there was a problem, Mr. Hall would address it with the employee.  *Id*. 91:1-4; 96:12-20.

In this case, Human Resources staff reviewed Mr. Mook's forms once completed and noticed a deficiency on the form related to information in Sections II and III being provided by the same person, which gave rise to concerns about authenticity.  Ms. Hancock from the Human Resources Department contacted Mr. Hall's office to inform him of the deficiency.  No one from Human Resources took any action to address the deficiency. Hodge Decl. ¶ 9. No one from the Human Resources Department contacted any medical provider who completed Mr. Mook's certification or had any communication with any medical provider related to Mr. Mook's leave request.  *Id*. ¶ 10. No one in the Human Resources Department had any contact with Mr. Mook related to the FMLA forms, the information contained on the forms, or actions necessary to address the deficiencies on the forms.  *Id*. ¶ 11. At no time did anyone in Human Resources tell

Mr. Hall that Mr. Mook should be terminated related to the completion of the FMLA forms, taking FMLA, or any other reason. *Id*. ¶ 12.

The Department also answers questions that Constitutional officers may have about employment procedures and processes. While the Human Resources Department may provide information related to employee investigations and discipline, the Human Resources Department does not conduct such investigations on behalf of the Constitutional officer and does not handle discipline for the officer. Hodge Decl. ¶ 5. Abusing FMLA policies and procedures could serve as grounds for termination if an employer decides that an employee abused the FMLA process. Falsifying or misrepresenting the reason for taking leave or providing false or misleading information on forms submitted to obtain leave under the FMLA could constitute reasons for an employer to discipline or terminate an employee for abusing FMLA leave. Hodge Decl. ¶ 13.

Compensation for the attorneys who work for Mr. Hall is determined by the Compensation Board. Hall Tr. 82:18-21. Within the range of salaries specified by the Compensation Board, the Commonwealth Attorney determines what each attorney is going to earn. *Id*. 84:5-9. The City provides the Constitutional officers with a stipend for their employees. *Id*. 18:12-24. Mr. Hall applies the city-provided stipend to the salaries that are otherwise provided by the Compensation Board. *Id*. 19:4-7. Mr. Hall determines what specific amount of supplement each attorney receives. *Id*. 81:15-18. The City also provides the Commonwealth Attorney with funding for the salary for one attorney position to review the body camera footage of the City's police officers pursuant to a formula provided by the General Assembly. *Id*. 16:9-23. Instead of using that funding to create one position to review police body camera footage, Mr. Hall chose to assign the duty of reviewing body camera footage to all of his attorneys. Mr. Hall could not state affirmatively how the funding for the position was divided (or if it was

divided) among the attorneys in his office. *Id*. 17:2-24. Mr. Hall approves the payroll for his

office before paychecks are issued.  No one at the City approves Mr. Hall's employees'

paychecks.  *Id*. 93:17-22.  Payroll for Mr. Halls' employees are line items on Mr. Hall's budget

and are itemized and designated as expenses of Mr. Hall's office.  *Id*. 94:8-14.

ARGUMENT

I.   STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact, and

the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*,

477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986), *Glynn v. EDO Corp.*, 710 F.3d 209,

213 (4th Cir. 2013). The relevant substantive law determines whether a fact is material.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A genuine dispute cannot be created

where there is only a scintilla of evidence favoring the nonmovant; rather, the Court must look to

the quantum of proof applicable to the claim to determine whether a genuine dispute exists. As

the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule

56(c), its opponent must do more than simply show that there is some metaphysical doubt as to

the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372,

380, 127 S. Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Industrial Co.* v. *Zenith Radio

Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (footnote omitted).

II.   PLAINTIFF FAILS TO PROVE INTERFERENCE WITH HIS FMLA RIGHTS.

"The FMLA makes it unlawful for any employer to 'interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided under [the FMLA]." *Snipes v. Sw. Va.

Reg'l Jail Auth*., 350 F. Supp. 3d 489, 492 (W.D. Va. 2018) (quoting 29 U.S.C. § 2615(a)(1))

12

"To state a claim for FMLA interference, [a plaintiff] must show that (1) they were an eligible employee, (2) the defendant was an FMLA-defined employer, (3) they are entitled to leave under the statute, (4) they gave notice to the employer that they would take FMLA leave, and (5) the defendant denied their FMLA rights." *Id*. at 492–93 (citing *Corbett v. Richmond Metro. Transp. Auth.*, 203 F. Supp. 3d 699, 709 (E.D. Va. 2016). "Interference includes refusing to authorize FMLA leave and discouraging an employee from taking FMLA leave." *Id*. at 493 (citing *Rodriguez v. Reston Hosp. Ctr., LLC*, No. 1:16-cv-623 (JCC/JFA), 2017 WL 772348, at *4 (E.D. Va. Feb. 28, 2017)). "An employer's conduct may constitute interference with an employee's FMLA rights if it would have a chilling effect and would discourage employees from exercising their FMLA rights." *Id*.

The City will not argue whether Mr. Mook was an eligible employee or whether Mr. Mook provided notice that he would take FMLA leave because Mr. Hall testified that Mr. Mook was on FMLA leave at the time of that the concerns with the Certification arose. Mr. Mook fails, however, to prove that the City was an FMLA-defined employer, that he was entitled to leave under the statute, and that the City violated his FMLA rights.

A.    The City was not Mr. Mook's Employer.

Under the FMLA, the term "employer" includes "any 'public agency,'" which embraces "the government of a State or political subdivision thereof; any agency of . . . a State; or [any agency of] a political subdivision of a State." 29 U.S.C. §§ 2611(4)(A)(iii). An FMLA employer also includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." *Id*. § 2611(4)(A)(ii)(I).

13

Commonwealth's Attorney G. Andrew Hall was Mr. Mook's employer, not the City. The City is also not a joint employer or an integrated employer with the Commonwealth Attorney under Fourth Circuit precedent.

The Fourth Circuit has recognized at least three tests—the economic realities test, the control test, and the hybrid test—for determining "whether an entity exercises control over an employee" such that it should be considered a joint employer. *Butler v. Drive Auto. Indus. of Am., Inc*., 793 F.3d 404, 410 (4th Cir. 2015)  In *Butler*, the Court found three factors to be most significant: "(1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work." *Id*. at 414 (cautioning that "control remains the principal guidepost for determining whether multiple entities can be a plaintiff's joint employers.").

As Mr. Hall testified, the Commonwealth Attorney is a duly elected Constitutional Officer, and the City has no supervisory authority over him or his employees.

Commonwealth attorneys are creations of the Virginia Constitution. Va. Const. Art. VII, § 4. "Their offices exist, abeyant and unfilled, by virtue of constitutional origination from the moment their county or city is created by the legislature. Their offices and powers exist independent from the local government, and they do not derive their existence or their power from it. Their compensation and duties are subject to legislative control, but only by state statute and not local ordinance."  *Roop v. Whitt*, 289 Va. 274, 280, 768 S.E.2d 692, 695 (2015); *see Carraway v. Hill*, 265 Va. 20, 24, 574 S.E.2d 274, 276 (2003); *see Dunn v. Millirons*, 176 F. Supp. 3d 591, 599 (W.D. Va. 2016), *aff'd*, 675 F. App'x 314 (4th Cir. 2017); *see* Va. Code § 15.2-1600.

14

Constitutional officers "are neither agents of nor subordinate to local government," and "[t]he local government has no control over their work performance." *Roop, 289 Va.* at 696. Local governing bodies are expressly denied the authority to require commonwealth attorneys to exercise a power or duty that they are not required to perform under state law or otherwise to diminish their powers or duties under the law – including "the power to organize their offices and to appoint such deputies, assistants and other individuals as are authorized by law upon the terms and conditions specified by such officers." Va. Code § 15.2-1600(B). Mr. Hall is adamant that he is responsible for staffing his office with attorneys, supervising and directing their work, and making all personnel decisions. The City has no authority to control Mr. Hall's decisions with respect to whom he employs, whether or how he terminates employees, how he operates his office, or what employment policies or practices he implements.

Assistant or deputy commonwealth attorneys like Mr. Mook are appointed by the commonwealth attorney and serve only "for a term coterminous with [the commonwealth attorney]." Va. Code §15.2-1626. A commonwealth attorney's employment of assistant commonwealth attorneys is approved by the Compensation Board, not by the City. *Id.* §15.2-1632. The salary for any commonwealth attorney, or deputy, is set by the state Compensation Board, not by the City. *See id.* §15.2-1627.1. A City may supplement a Commonwealth Attorney's compensation or that of his deputy or assistant commonwealth attorneys by statute, but no provision of law authorizes the City to exercise any control over a commonwealth attorney or his employees. *See,* Va. Code § 15.2-1605.1; § 15.2-1600(B). Mr. Hall determined how the City's supplements would be allocated to his attorneys' salaries.

Mr. Mook admits that he was hired by Mr. Hall, that Mr. Hall supervised and directed his work, that Mr. Hall had the authority to discipline him, that Mr. Hall provided him with the

equipment necessary to perform his job, that Mr. Hall owned such equipment, and that Mr. Hall ultimately terminated his employment. Mr. Mook also admits that Mr. Hall was the individual who raised concerns with him about the content and completion of the FMLA Certification. Mr. Mook also admits that Mr. Hall terminated him due to concerns about his dishonesty.

Mr. Hall admits that the City did not direct him to terminate Mr. Mook's position although Ms. Hancock may have recommended it to Ms. Sherman. Mr. Hall, however, has the authority to accept or reject the recommendations of the Human Resources Department. Mr. Hall acknowledges that the decision to terminate Mr. Mook was his alone, based upon his own judgment.

For the same reasons, the City is not an "integrated employer" with the Commonwealth's Attorney. The "integrated employer" doctrine imputes liability to companies for employment violations where the companies are "so interrelated that they constitute a single employer." *Hukill v. Auto Care, Inc*., 192 F.3d 437, 442 (4th Cir. 1999). The Fourth Circuit has articulated a non-exhaustive, four-factor test to determine whether separate entities should be treated as a single employer for purposes of the FMLA: "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." *Id*. (citing 29 C.F.R. § 825.104(c)(2)). "[C]ontrol of labor operations is the most critical factor." *Id*. (citing *Schweitzer v. Advanced Telemarketing Corp*., 104 F.3d 761, 764 (5th Cir. 1997)). No evidence supports a conclusion that the City and the Commonwealth Attorney have common management, have an interrelation between operations, centralized control of labor relations, or common financial control. At most, the City acts as a fiscal agent for the Commonwealth Attorney and provides the Commonwealth Attorney with resources that permit him to manage his labor force.

Similarly, no evidence supports a conclusion that the City acted in the interest of the Commonwealth Attorney with respect to any of the Commonwealth Attorney's employees. While the Human Resources Department provides the Commonwealth Attorney with logistical support, it does not act on the Commonwealth Attorney's behalf with respect to any of his employees.  It also had no communication directly with Mr. Mook related to his leave.  All concerns related to Mr. Mook's leave request were handled directly by Mr. Hall and Ms. Sherman.  All the Department did was provide Mr. Hall with blank FMLA forms.  Ms. Sherman completed Section I of the form on behalf of the employer.  When Ms. Hancock noticed that Sections II and III were completed in the same handwriting, she alerted Ms. Sherman.  No one from the City ever had any contact with Mr. Mook or his medical providers related to his leave.

The City processes the Commonwealth Attorney's payroll, but the Commonwealth Attorney approves payroll for his employees, and payroll is an expense in his budget, not the City's.  The City provides no greater support to the Commonwealth's Attorney than a payroll processing company provides to private employers.

The evidence fails to prove that the City is Mr. Mook's employer, or that the City took any actions to have violate Mr. Mook's rights. Accordingly, the Complaint must be dismissed against the City.

      B.    <u>Mr. Mook was not entitled to leave under the FMLA.</u>

"[A]n employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's . . . provisions." *Sharif v. United Airlines, Inc*., 841 F.3d 199, 206 (4th Cir. 2016).

On November 12, 2021, Mr. Mook submitted a fraudulent Certification seeking 120 days of FMLA leave to provide care for his mother beginning on November 1, 2021. Mr. Mook asked a nurse to sign the form that he had completed, and Mr. Hall was concerned that Mr. Mook was

not honest with the nurse in how the form was presented for signature. Dr. Lisa Francis disavowed that form and required Mrs. Mook to submit for an examination in order to complete the Certification.

Dr. Lisa Francis testified that her certification on November 22, 2021, of medical necessity was based on a planned spinal surgery scheduled to occur more than four months later, in March of 2022, and the medical necessity was related to Mrs. Mook's post-surgical recovery period, which would begin on the date of surgery and continue for approximately three months after surgery. Dr. Francis testified that her certification was not based on Mrs. Mook's diagnosis of osteoporosis or osteoarthritis generally.

The FMLA leave that Mr. Mook sought would have been exhausted prior to his mother's scheduled surgery. Mr. Mook recognized that he would not have leave available at the time that such leave would have been medically necessary for his mother, and instead of ensuring that he had leave available to provide her with post-surgical care, Mr. Mook's intention was to have his mother placed in an assisted living facility after her surgery.

C.   The City did not interfere with Mr. Mook's rights under the FMLA.

Mr. Mook alleges that the City interfered with his right to take family care leave in violation of 29 U.S.C. § 2615(a)(1) by terminating him and by "directly contacting" Dr. Francis's office in violation of 29 C.F.R. § 825.307(a) to authenticate the Certification. The City neither terminated Mr. Mook nor contacted Dr. Francis' office.

When concerns arose about the authenticity of the Certification, Mr. Hall's staff, not employees from the City, contacted Dr. Francis's office to authenticate the Certification. The City played no role in any communication with Dr. Francis' office.

Mr. Mook further alleges that his employer violated two federal regulations by contacting Dr. Francis's office. First, he claims that by not advising him that the Certification was "incomplete or insufficient" prior to contacting the doctor's office, that Mr. Hall violated 29 C.F.R. § 825.305(c), which states:

> The employer shall advise an employee whenever the employer finds a certification incomplete or insufficient and shall state in writing what additional information is necessary to make the certification complete and sufficient. A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive. 29 C.F.R. § 825.305(c)

Mr. Mook's Certification, however, was not incomplete or insufficient; it was fraudulent.

Mr. Mook's Certification was not incomplete. All the required blanks were filled in. It was also not insufficient, because it was complete, clear, unambiguous, and responsive. The Certification appeared to be inauthentic, however, based on the fact that the handwriting in Sections II and III appeared to match.  The regulations permit an employer to ensure that the person who signed the Certification completed the medical information contained on the form. Ms. Sherman did this by faxing a copy of the certification to the doctor's office and asking whether it was completed and/or authorized by Dr. Francis. The regulations at 29 C.F.R. § 825.305(c) do not require that an employer who suspects a Certification is *forged or invalid* contact the employee first.

The provisions of 29 C.F.R. § 825.307(a) permit an employer to contact a health care provider for purposes of clarification and *authentication of the medical certification* (whether initial certification or recertification) after the employer has given the employee an opportunity to cure any deficiencies related to incompleteness or insufficiency as set forth in § 825.305(c).

19

*Id.* Requesting that a medical office to confirm that signatures and information are *authentic* is not requesting "additional [health-related] information from the medical provider."

The regulations are clear that while an employer must consult an employee first if substantive parts of the certification are missing or impossible to understand, there is no obligation to do so if the employee is suspected of fabricating a certification.

D.    The City did not deny Mr. Mook's request for leave under the FMLA.

The City neither granted nor denied Mr. Mook's leave request under the FMLA. It did not have the authority under the law to make such decisions for Mr. Hall. Mr. Hall testified that he considered Mr. Mook to be on FMLA leave as of November 1, 2021.

Mr. Mook was never denied leave. His Certification form was dated by his employer on Friday, October 29, 2021. His leave was to begin the following Monday, November 1, and did begin. Mr. Mook was out of the office and at his mother's doctor's office in Marshfield, Wisconsin, on Friday, November 12, 2021. He remained on leave through his termination on November 18, 2021.

E.    The City did not terminate Mr. Mook in violation of the FMLA.

The City did not terminate Mr. Mook. Both Mr. Hall and Mr. Mook agree that Mr. Hall terminated Mr. Mook's employment. Moreover, Mr. Hall agrees that the City did not have the authority to terminate Mr. Mook's employment.

Mr. Mook's FMLA interference claim relies on the fact that his employment was terminated because he submitted a fraudulent certification obtained under false or misleading circumstances. "The FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior." *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304-5 (4th Cir 2016). "[W]hen an employer gives a legitimate,

nondiscriminatory reason for discharging the plaintiff, it is not our province to decide whether

the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the

plaintiff's termination." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013). Mr. Mook

was terminated for lying and for making misleading statements related to his request for FMLA

leave, which constitutes FMLA abuse.

In *Adkins v. CSX Transp., Inc.*, 70 F.4th 785 (4th Cir. 2023), the Fourth Circuit was

presented with the question of whether there was any basis for a determination of FMLA

interference and wrongful termination when a group of employees submitted identical

certification forms demanding eight weeks of leave for minor muscular pulls, all from the same

two health providers. CSXT investigated the claims and terminated the employees for benefits

fraud. The court, on appeal, held that CSXT was justified in so doing, stating that:

> The FMLA serves the important purpose of allowing employees to take leave for
> legitimate family needs and medical reasons, but it is not a right that can be
> fraudulently invoked with impunity. In order to maintain the integrity of the
> FMLA, employers must be able to investigate and address plausible allegations
> that employees have been dishonest in their medical leave claims. In this case,
> CSXT did just that, and the plaintiffs have failed to meet their burden of showing
> that CSXT's explanation for their termination – that is, that the company
> determined that the employees had violated workplace rules regarding dishonesty
> – was pretextual.

*Id.* at 797.

In *Egler v. Am. Airlines, Inc.*, No. 5:17-CV-73-FL, 2019 U.S. Dist. LEXIS 27258, at *11

(E.D.N.C. Feb. 21, 2019), a plaintiff was terminated after taking FMLA and submitting

certifications believed to be fraudulent and confirmed to be so after the employer spoke to the

doctor in question. In that case, as here, the plaintiff tried to argue that the certifications were not

fraudulently produced. The Fourth Circuit held that such arguments were irrelevant to the

question of pretext, finding that "plaintiff must demonstrate that the reason given by defendant

was dishonest, false, or 'not credible, or that the employer's decision was more likely the result of retaliation.'" *Id.* (quoting *Sharif*, 841 F.3d at 203).

Because the City did not take any employment action against Mr. Mook or deny his FMLA rights, the Complaint against it must be dismissed.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant, the City of Martinsville, by counsel, requests that the case against it be dismissed with prejudice and for such other and further relief as the nature of this case requires.

CITY OF MARTINSVILLE, VIRGINIA

 /s/ Jennifer D. Royer
Of Counsel

Jennifer D. Royer, VSB # 68099
3042 Brambleton Avenue, SW
Roanoke, Virginia 24015
540-788-2982  Telephone
540-675-4093  Facsimile
jroyer@royerlawfirm.com
Counsel for Defendant City of Martinsville, Virginia

<u>CERTIFICATE</u>

I hereby certify that on the 18th day of April, 2025, I have electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jennifer D. Royer
Jennifer D. Royer, VSB # 68099

22

ROYER LAW FIRM, P.C.
3042 Brambleton Avenue, SW
Roanoke, Virginia 24015
540-788-2982  Telephone
540-675-4093  Facsimile
jroyer@royerlawfirm.com
Counsel for Defendant City of Martinsville,
Virginia