CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
6/5/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| DANIEL P. MOOK, | ) |
| Plaintiff, | ) Case No. 4:23-cv-00028 |
| v. | ) **MEMORANDUM OPINION** |
| CITY OF MARTINSVILLE, VIRGINIA, and G. ANDREW HALL, | ) By:   Hon. Thomas T. Cullen<br>) United States District Judge |
| Defendants. | ) |

This matter is before the court on Defendant G. Andrew Hall's motion for summary judgment on Plaintiff Daniel Mook's Family Medical Leave Act ("FMLA") interference claim. The court will deny Hall's motion because genuine disputes of material fact remain as to whether Hall interfered with Mook's FMLA rights, and Hall is not entitled to qualified immunity.

## I.   STATEMENT OF FACTS

The following facts are either undisputed or presented in the light most favorable to Mook, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011).

Mook was employed as an Assistant Commonwealth's Attorney in the City of Martinsville from April 3, 2018, until November 18, 2021. (Dep. of Daniel Mook 21:21–22:2 [ECF No. 52-2]; Def. Hall's Mot. Summ. J., Ex. 2 [ECF No. 52-3].) Throughout that time, Hall—the Commonwealth's Attorney for the City of Martinsville—was Mook's supervisor. (Mook Dep. 26:8–10.) On November 18, 2021, Hall terminated Mook after accusing him of

"falsifying" a record in connection with a request for FMLA leave. (Def. Hall's Mot. Summ. J., Ex. 2.)

Mook's mother, Shirley Mook ("Mrs. Mook"), suffers from severe osteoporosis. (Dep. of Lisa Francis, M.D. 38:6–21 [ECF No. 52-4].) Dr. Lisa Francis is Mrs. Mook's healthcare provider and treats Mrs. Mook's osteoporosis. (Francis Dep. 10:19–11:2.) In May 2020, Mook took FMLA leave to care for his mother. (Dep. of Andrew Hall 7:16–8:11 [ECF No. 52-5].) In November 2021, he again requested FMLA leave for the same purpose. (Def. Hall's Mot. Summ. J., Ex. 5, at 1 [ECF No. 52–6].) To get his leave approved, Mook was asked to submit a completed Certification of Health Care Provider for Family Member's Serious Health Condition under the Family and Medical Leave Act form (the "certification form") to the City of Martinsville's ("the City's") human resources ("HR") department by November 15, 2021. (*Id.*)

Mook filled out the certification form—including Section III, titled "HEALTH CARE PROVIDER," which is supposed to be filled out by a medical professional. (Mook Dep. 29:9–14.) The language of Section III is directed at a healthcare provider, stating, "[a] family member of *your patient* has requested leave under the FMLA to care for *your patient*." (Def. Hall's Mot. Summ. J. Ex. 5, at 3 (emphasis added).) It instructs the provider to fill out the form "based upon your medical knowledge, experience, and examination of the patient." (*Id.*) Mook filled out Section III of the form based on the information on the certification form for the FMLA leave he had taken the prior year and his knowledge of his mother's maladies. (Resp. to Hall's Mot., Ex. 3, at 2 [ECF No. 58–3].) When Mook took his mother to Dr. Francis's office for

her to receive a Prolia injection on November 12, he presented the form to Scott Schmidt, RN, for signature. (Mook Dep. 28:16–29:17.)

The circumstances surrounding Nurse Schmidt's signing of the form are hotly disputed. According to Mook, he told Nurse Schmidt that he needed an FMLA form completed for his employer, explained that he had filled out the entire form, but expressly noted that "if any changes needed to be made," Nurse Schmidt "should go ahead and do that." (Mook Dep. 29:9–14.) Nurse Schmidt took the form from Mook, left the examination room "for approximately two minutes, came back," and asked Mook "where he should sign." (*Id.* at 29:15–17.) Mook asserts he gave Nurse Schmidt all four pages of the form. (*Id.* at 30:1–3.) He did not see or speak with Dr. Francis that day. (*Id.* at 29:18–20.)

Nurse Schmidt tells a different story. He contends that he "remember[s] signing something," but he "wasn't sure why it was given to [him] instead of the doctor." (Dep. of Scott Schmidt, RN 10:8–12.) He assumed that the form was a work excuse "for the day of," which is why he signed it himself, rather than taking it to Dr. Francis. (*Id.* at 11:9–12:2.) He doesn't remember whether the person who gave him the form was the patient's "son or not"; he doesn't recall how many pieces of paper he was given; he "didn't read through it" before signing; and he assumed "that it was for that day" because "that's usually what people do." (*Id.* at 10:20–11:5, 13:6–9.) He also testified at his deposition that if he had been given an FMLA form, "that would have gone to Dr. Francis." (*Id.* at 13:13–16.) Typically, "the driver or the spouse or family member will say why they need it signed, and by the doctor, and then [the nurse] would give it to the doctor." (*Id.* at 13:17–20.) Nurse Schmidt testified that he does not know why, if the form "was the FMLA form," Mook "gave it to [Nurse Schmidt] versus seeing

- 3 -

the doctor." (*Id.* at 13:21–14:1.) Had Nurse Schmidt known the form was an FMLA certification, he claims he would have given it to Dr. Francis, as she was the doctor "in charge of that patient." (*Id.* at 14:19–15:3.)

Regardless of what transpired in the doctor's office that day, it is undisputed that after Nurse Schmidt signed the certification form, Mook faxed it to the City of Martinsville's HR department and to Hall's office. (Mook Dep. 33:6–13.) Sometime later, Hall's administrative assistant, Nancy Sherman, told Hall that there "was a problem with the certification and that it appeared that [Mook] had . . . filled out the [section] that was supposed to be signed by the doctor" himself. (Hall Dep. 21:5–17.) Sherman also informed Hall that Nurse Schmidt had asserted that when he signed the form, Mook had told Nurse Schmidt "that he needed basically a work excuse signed" and that Nurse Schmidt had not known "that he was signing something regarding family medical leave." (*Id.* at 22:1–26.) Hall understood that Sherman had spoken to Dr. Francis's office "to determine whether that was Mr. Schmidt's signature." (*Id.* at 24:13–18.)

On November 18, Hall called Mook to discuss the situation; he recorded their conversations.[1] Hall first asked Mook whether he filled out the certification form himself and whether he deceived Nurse Schmidt into signing the form. (Call 1 at 00:39–00:42.)[2] Mook immediately admitted to filling out the form himself, but vehemently denied deceiving Nurse Schmidt. (*Id.* at 00:42–00:54, 4:38–5:24) He explained that he had told Nurse Schmidt that he

---

[1] Hall and Mook spoke twice on November 18. While there were two calls, both concerned the same subject and the court treats them as one conversation.

[2] Recordings of these calls, which Hall submitted with his motion for summary judgment, are on file with the clerk. (*See* ECF No. 55.) Citations to the calls are to the time on the file.

was free to make any changes if he needed to. (*Id.* at 3:03–3:07.) Unprompted, Mook also offered to take another form to Dr. Francis's office so that Dr. Francis could fill out Section III herself. (*Id.* at 4:05–4:11.) Nevertheless, Hall maintained that Mook had shown poor judgment by filling out the form himself, that his doing so cast doubt on his honesty, and he told Mook he would have to terminate him. (*Id.* at 6:05–6:18, 7:26–7:56; Call 2 at 1:06–1:34, 6:00–6:36.) Hall also claimed during this call that HR had recommended that Mook be terminated. (Call 1 at 7:56–8:06.) Hall offered Mook the opportunity to resign in lieu of being terminated, though he stated that HR wouldn't like it. (*Id.* at 9:19–9:45.) When Mook refused to resign, Hall terminated him. (Call 2 at 14:00–14:22.)

On November 22, 2021, after Mook was terminated, Dr. Francis filled out a second certification form. (Def. Hall's Mot. Summ. J., Ex. 5, at 5.) She completed this form for Mook "to take care of [Mrs. Mook] during and after her spine surgery." (Francis Dep. 11:7–8.) Mrs. Mook did not undergo surgery until March of 2022, but had to attend many appointments leading up to her surgery date. (Francis Dep. 37:1–9.)

Mook filed suit against Hall and the City on November 16, 2023, alleging FMLA interference. (Compl. [ECF No. 1].) Hall moved for summary judgment on April 18, 2025. (Def. Hall's Mot. Summ. J. [ECF No. 52]; Def. City's Mot. Summ. J. [ECF No. 53].) The parties fully briefed the motion, which is now ripe for disposition.[3]

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[3] The court dispenses with oral argument because it would not aid the decisional process.

entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits'" filed by the parties. *Celotex*, 477 U.S. at 322 (quoting former Fed. R. Civ. P. 56(c)). Whether a fact is material depends on the relevant substantive law. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party carries its burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (cleaned up) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. But the nonmoving party must "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213

(quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

Even though summary judgment may be an appropriate tool to eliminate trial in some cases, it "must be used carefully so as not . . . to foreclose trial on genuinely disputed, material facts." *Thompson Everett, Inc. v. Nat'l Cable Adv., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "The question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334 (4th Cir. 2011) (emphasis in original).

### III.   ANALYSIS

#### A. Hall is an employer under the FMLA

In his motion, Hall first argues that his office is not an employer within the meaning of the FMLA. As relevant here, "a 'public agency' as defined in section 3(x) of the Fair Labor Standards Act of 1938" is an FMLA employer. 29 U.S.C. § 2611(4)(A)(iii). The Fair Labor Standards Act, in turn, defines public agencies to include "the government of a State or political subdivision thereof" and "any agency of . . . a political subdivision of a State." 29 U.S.C. § 203(x).

Hall argues that, as a Virginia constitutional officer, his "duty of loyalty and performance" is "to the people who elect him in a particular jurisdiction rather than the Commonwealth of Virginia as a whole." (*See* Def. Hall's Mot. Summ. J. at 13 [ECF No. 52-1] (quoting *City of Va. Beach v. Commonwealth*, 19 Va. Cir. 283, 284–85 (1990)).) Consequently, he "is independent of municipal or county and state governments." (*Id.* (quoting *City of Va. Beach*, 19 Va. Cir. 284–85).) On that basis, Hall asserts that he is "neither a political subdivision of the Commonwealth nor an interstate governmental agency of the Commonwealth." (*Id.*) That is true, as far as it goes, but it fails to address the latter part of the definition of "public agency" encompassing "any agency of . . . a political subdivision of a State." *See* 29 U.S.C. § 203(x).

By statute, the Commonwealth's Attorney is "part of the department of law enforcement of the county or city in which he is elected or appointed." Va. Code Ann. § 15.2-1627(B). As a matter of common sense, a city's "department of law enforcement" and its constituent parts are agencies of that city just as the Department of Justice and the agencies within it are agencies of the United States federal government. The court therefore concludes that Hall is an employer within the meaning of the FMLA.

## B. There is a genuine dispute of material fact over FMLA interference

Hall next contends that his actions do not constitute interference under the FMLA. "The FMLA makes it unlawful for any employer to 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." *Snipes v. Sw. Va. Reg'l Jail Auth.*, 350 F. Supp. 3d 489, 492 (W.D. Va. 2018) (quoting 29 U.S.C. § 2615(a)(1)) (alteration in original). "To state a claim for FMLA interference, [a plaintiff] must show that (1) they were an eligible employee, (2) the defendant was an FMLA-defined employer, (3) they

are entitled to leave under the statute, (4) they gave notice to the employer that they would take FMLA leave, and (5) the defendant denied their FMLA rights." *Id.* at 492–93 (citing *Corbett v. Richmond Metro. Transp. Auth.*, 203 F. Supp. 3d 699, 709 (E.D. Va. 2016). "Interference includes refusing to authorize FMLA leave and discouraging an employee from taking FMLA leave." *Id.* at 493 (citing *Rodriguez v. Reston Hosp. Ctr., LLC*, No. 1:16-cv-623 (JCC/JFA), 2017 WL 772348, at *4 (E.D. Va. Feb. 28, 2017)). "An employer's conduct may constitute interference with an employee's FMLA rights if it would have a chilling effect and would discourage employees from exercising their FMLA rights." *Id.* An employer's "failure to follow regulatory requirements" constitutes FMLA interference if the employee can additionally show "that the failure denied, interfered with, or restrained the employee's FMLA rights." *Matson v. Sanderson Farms, Inc.*, 388 F. Supp. 3d 853, 873 (S.D. Tex. 2019).

Most of Hall's arguments in support of this point amount to no more than an effort to relitigate the court's ruling interpreting the applicable regulations in denying Hall's motion to dismiss. If Hall disagrees with the court's prior decision, he is free to take up the issue on appeal at the appropriate time. But the court is not inclined to overturn its own prior ruling.[4] If the court agreed with Hall, it would have said as much when ruling on his motion to dismiss and saved everyone involved significant time and effort. The court maintains that its prior

---

[4] And even if it was, it would do Hall no good. Even if his interpretation of the regulation is correct, and even if his "fraud investigation" permitted him to contact Mook's doctor directly without giving Mook the opportunity to have the correct person fill out the information in Section III, he could still be liable for FMLA interference if a jury finds his "suspicion of fraud" charge to be dubious under the facts available to him. The jury might believe that Hall's accusation that Mook is a dishonest actor who could not be trusted despite years of unblemished service as a lawyer because he improperly filled out a form (and readily admitted to doing just that when asked) was a pretext to avoid granting Mook his requested leave.

- 9 -

ruling was correct, so it will reject these arguments for the reasons that follow as well as those detailed in its prior opinion. (*See* Mem. Op. [ECF No. 24].)

Hall first argues that, as a matter of law, contacting Mook's mother's medical provider was not an FMLA violation because the applicable regulations do not require employers to give employees notice and an opportunity to cure certification forms when they are *authenticating*—as opposed to *clarifying*—submitted forms. (Def. Hall's Mot. Summ. J. at 14–18.) That is the same argument Hall made—and this court rejected—at the motion to dismiss stage. (*See* Mem. Op. at 8–10.)

Hall next argues that he did not violate the curing provision because compliance was not practicable under the circumstances. (*See* Def. Hall's Mot. Summ. J. at 18.) This is no more than a repackaged version of Hall's original argument. Hall does not explain why Mook could not have gone back to his mother's medical provider and asked them to fill the certification form out again—this time with a physician completing Section III of the form—within the seven-day curing window. Instead, Hall argues that the certification is "incurable" because Mook improperly filled it out himself. (*See id.* at 19.) In its opinion at the motion to dismiss stage, this court held that the notice and curing requirements in § 825.305(c) apply where the alleged deficiency concerns who filled out the certification. (Mem. Op. at 9 (holding that an employer "must give its employee a chance to cure any purported deficiencies in the certification" before contacting the health-care provider to verify "that the information contained on the certification form was completed and/or authorized by the health care provider who signed the document" (quoting 29 C.F.R. § 825.305(c))).) And the court

expressly stated that Mook filling out Section III of the certification form "would have been easy to cure, had [Hall] given Mook the opportunity." (*Id.* at 9 n.7.)

Again, Hall's argument is merely an effort to relitigate issues the court already decided. The court will not reconsider its prior ruling. This is not a case in which discovery reveals that the allegations of the complaint are unsupported by the record. The developed record reveals the same undisputed fact that the court accepted as true based on the complaint: that Mook filled out Section III himself, rather than having a physician complete that section of the form. The court held at the motion to dismiss stage that a deficiency of that type is curable under the regulation, and that ruling still applies.

Hall also argues that *even if* he was required to notify Mook and give him the opportunity to cure the certification form, Mook's claim still fails because the certification was fraudulent. *See Sharif v. United Airlines, Inc.*, 841 F.3d 1999, 206 (4th Cir. 2016) ("[A]n employee who fraudulently obtains FMLA leave from an employer is not protected by FMLA's provisions."). To the extent that Hall argues that he was not required to give Mook notice and an opportunity to cure, Hall's argument is contrary to the court's prior ruling. In its prior ruling, the court expressly considered whether § 825.305(c) applies when the employer purports to be investigating fraud. The court held that a purported fraud investigation is not a shield against § 825.305(c)'s requirements on the facts alleged. (Mem. Op. at 10.) That legal conclusion has not changed.

To the extent that Hall argues that Mook cannot obtain relief because the certification was in fact fraudulent, that fact is vigorously disputed. The fact that Mook completed Section III himself only makes the certification fraudulent if Mook intended to deceive his employer.

- 11 -

*See Fraud*, Black's Law Dictionary (2d ed.) *available at* https://thelawdictionary.org/fraud/ ("Fraud consists of some deceitful practice or willful device, resorted to with intent to deprive another of his right, or in some manner to do him an injury. As distinguished from negligence, it is always positive, intentional.") Viewed in the light most favorable to Mook, the facts are that Mook filled out Section III based on the information provided on the certification form for the FMLA leave he took the prior year; Mook presented all four pages of the certification form to Nurse Schmidt for signature and told Nurse Schmidt that "if any changes needed to be made" Nurse Schmidt "should go ahead and do that"; Nurse Schmidt briefly left the room with the form and then returned and asked Mook where he should sign. (Resp. to Hall's Mot., Ex. 3, at 2; Mook Dep. 29:9–17.) Those facts do not establish intent to deceive beyond dispute—far from it. Hall argues that Mook is not entitled to relief because Hall had a "genuine belief that Mook was dishonest" (Def. Hall's Mot. Summ. J. at 24), but Hall's belief must still be reasonable. Whether Hall's belief was reasonable under these circumstances—and whether those beliefs were the actual motivation for his decision to fire Mook—is ultimately a question for the jury. *Cf. Sutphin v. Ethicon, Inc.*, No. 2:14-cv-01379, 2020 WL 2517235, at *4 (S.D.W.V. May 15, 2020) ("The reasonableness of conduct and a party's then-existing state of mind are the sort of questions that lay jurors have been answering . . . from time immemorial." (internal quotation omitted)).

Hall also points to the certification form Mook submitted on November 22 as evidence of fraud. (*See* Def. Hall's Mot. Summ. J. at 24.) Even if the record were undisputed that the second form is fraudulent—which it is not—the court is hard pressed to see how a form submitted after Mook's termination can retroactively justify the termination or Hall's conduct

leading up to it. Any purported fraud relating to the second form does not obviate the factual dispute concerning whether Mook's efforts to seek FMLA leave using the first form were fraudulent, which remains for the jury to resolve.

It is true, as Hall points out, that "[t]he FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior," *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304–05 (4th Cir. 2016), and it is likewise true that the FMLA does not protect employees who seek to fraudulently invoke its protections, *see Sharif*, 841 F.3d at 206. If "an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff," the court may not decide "whether the reason was wise, fair, or even correct, ultimately, so long as it *truly* was the reason for the plaintiff's termination." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (emphasis added). But courts also do not blithely accept an employer's proffered justification in the face of contrary evidence. In this case, the court concludes that the circumstances raise a factual question about whether Mook's purported dishonesty "*truly* was the reason for the plaintiff's termination," or whether it was a pretext to avoid granting Mook's requested FMLA leave. *Id.* (emphasis added). The court, therefore, holds that genuine disputes of material fact preclude granting summary judgment to Hall in this case.

### C. Hall is not entitled to qualified immunity

Hall also urges the court to grant summary judgment on qualified immunity grounds because "a reasonable person in Hall's position would have failed to appreciate that terminating Mook because of potential dishonesty and poor judgment violated Mook's FMLA rights." (Def. Hall's Mot. Summ. J. at 28.)

Qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To overcome this shield, a plaintiff must demonstrate that: (1) the defendant violated the plaintiff's constitutional [or statutory] rights, and (2) the right in question was clearly established at the time of the alleged violation." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

The Fourth Circuit has not resolved whether qualified immunity is applicable to FMLA claims, but courts generally agree that qualified immunity applies if the public official's violation of the FMLA is not clearly established. *See, e.g.*, *Stramaski v. Lawley*, 44 F.4th 318, 327 (5th Cir. 2022); *Sterling v. Bd. of Trustees of the Univ. of Ark.*, 42 F.4th 901, 904 (8th Cir. 2022); *Smith v. Sch. Bd. for the City of Norfolk*, No. 2:21-cv-138, 2021 WL 5163312, at *10 (E.D. Va. Nov. 5, 2021). The court proceeds on that assumption.[5]

---

[5] Even so, the court has concerns about applying qualified immunity in contexts such as this where a public official is *not* exercising any of his governmental authority but rather stands in the same shoes as any private employer under the same circumstances. In the run-of-the-mill qualified-immunity case that the court encounters, law enforcement officers are alleged to have violated a private citizen's constitutional rights while engaging in some act relating to the duties inherent to their office. *See, e.g., Trail v. Cressell*, 494 F. Supp. 3d 349, 353 (W.D. Va. 2020) (considering whether a sheriff's deputy is entitled to qualified immunity for an arrest alleged to be without probably cause). Of course, qualified immunity applies to a broader class of cases and extends to violations of statutory rights as well. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). But there is something qualitatively different about a case in which a member of the public sues a public official based on the public official's conduct in exercising authority inherent to his office as compared to this case, in which an employee sued their employer acting in the same manner as any private employer might, but where the employer happens to also be a public official. Because Hall is an "employer" within the meaning of the FMLA, it seems that he should be liable under the FMLA to the same extent as any other FMLA-employer in an FMLA case. Congress made the decision to extend the FMLA's protections to employees of public agencies (headed by public officials). Permitting qualified immunity to strip some of the FMLA's protections from those employees—when similarly situated private employees retain their protections—seems antithetical to the FMLA's purpose. Nonetheless, because Mook does not argue that qualified immunity is inapplicable in the FMLA context, the court will assume the doctrine applies.

Hall contends that, though the FMLA's *statutory* protections against interference are "clearly established," Mook's rights under the *regulations* are not. Hall does not dispute—nor can he—that public officials who qualify as employers under the FMLA are bound by the regulations in the same manner as private employers. Holding otherwise would permit public-official employers to violate the regulations with impunity, at least until binding case law clarifies that specified conduct is impermissible. Consequently, the regulations, like the FMLA's statutory provisions, "clearly establish" an employee's FMLA rights. And in this case, the regulation is clear. As this court stated in its opinion denying Hall's motion to dismiss, a "plain reading of the regulations" demonstrates that Hall should have *first* notified Mook and given him an opportunity to cure if Hall believed that someone other than a healthcare provider filled out the form. (Mem. Op. at 9.) Because the regulation is clear, Hall cannot escape liability on the basis that there is no caselaw applying this particular regulation to a public official under these circumstances. [6] Therefore, the court concludes that Hall is not entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons the court will deny Hall's motion for summary judgment. The court concludes that genuine disputes of material fact remain as to whether Hall interfered with Mook's FMLA rights and Hall is not entitled to qualified immunity in this case.

---

[6] But even if the regulation were not clear, or if the regulation itself could not "clearly establish" a plaintiff's rights, Hall still would not be entitled to qualified immunity. As the court explained, this case raises a genuine dispute of material fact about whether Hall's allegations of fraud are genuine, or whether they are mere pretext to avoid granting Mook's requested leave. Hall concedes that the FMLA's statutory protections are "clearly established," and it is black letter law that an employer cannot defeat an FMLA claim if his proffered "non-discriminatory explanation" is pretextual. *See, e.g.*, *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006.)

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 5th day of June, 2025.

/s/ *Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE